29 F.3d 1355
 Julia ALEXANDER, as executor of the estate of Henry O.
Quade, Jr., deceased, Plaintiff-Appellant,
v.
CITY AND COUNTY OF SAN FRANCISCO, Frank Jordan, John
Willett, Timothy Hettrich, Joaquin Santos, Matthew
Castagnola, David Seid, Bernard Sullivan, Richard Lee, David
Shinn, James Dachauer, Patrick White, Joseph Kennedy,
Richard Heller, Steven Gough, Edward St. Andre, Nicholas
Borthne, Richard Cunningham, Albert Chinn and Michael
Lennon, Defendants-Appellees.
 No. 92-16751.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1994.
Decided July 8, 1994.
 
 Monti J. Stegen, Kagel & Stegen, San Francisco, CA, for plaintiff-appellant.
 Jean S. Fraser, Deputy City Atty., San Francisco, CA, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before: FLETCHER, KOZINSKI and TROTT, Circuit Judges.
 Opinion by Judge FLETCHER; Concurrence by Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge TROTT.
 FLETCHER, Circuit Judge:
 
 
 1
 This civil rights action is brought by the executor of the estate of Henry Quade, who was shot dead in his home by San Francisco police officers. Plaintiff alleges that Quade's Fourth Amendment rights were violated (1) because the officers entered Quade's home for the purpose of arresting him, but had only an administrative inspection warrant in their possession; and (2) because the officers used excessive force in their entry, thus precipitating the escalation of force which ended in the fatal shooting. Plaintiff also seeks to hold the City and County of San Francisco liable for failure to adequately train the officer in command of the operation.
 
 
 2
 The district court granted summary judgment for all defendants, holding (1) that Quade was never arrested, and that any detention of Quade by the officers was lawful; and (2) that the officers were entitled to qualified immunity on the excessive force claim. The court also held that because all of the individual defendants were entitled to summary judgment, no liability could attach to the municipality.
 
 
 3
 We reverse the summary judgment in favor of the individual defendants and affirm the judgment in favor of the municipality, although on different grounds than those relied on by the district court.
 
 BACKGROUND
 A. Factual Background
 
 4
 In June 1990, the San Francisco Public Health Department received a complaint from a neighbor of Henry Quade that sewage was seeping from Quade's basement into the street and into the foundation of the neighbor's house, that a foul odor was coming from Quade's house, and that Quade's backyard was filled with refuse.
 
 
 5
 Health Department officials went to Quade's home to inspect, but no one came to the door. The Health Department sent Quade a Notice to Abate Nuisance, and contacted other interested city agencies. When Health Department officials found the situation unchanged, they summoned Quade to an abatement hearing, which he did not attend. They summoned him to a second and a third abatement hearing, which he did not attend either. They summoned him to a hearing before the Director of Public Health, which once again he did not attend. After his failure to attend the hearing before the director, they sent Quade a letter, and then another letter, requesting him to make an appointment for an inspection of his property. When he did not respond, officials applied to a municipal court judge for an inspection warrant.
 
 
 6
 The inspection warrant was issued pursuant to Title 13 of the California Code of Civil Procedure, which provides that upon a showing of cause, a court shall command a state or local official
 
 
 7
 to conduct any inspection required or authorized by state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning.
 
 
 8
 Cal.Code Civ.Proc. Sec. 1822.50. "Cause" exists if, inter alia, "there is reason to believe that a condition of nonconformity exists with respect to the particular place." Cal.Code Civ.Proc. Sec. 1822.52. The warrant in this case was issued "for the purpose of discovering if the subject property complies with the Health, Building, Housing, Plumbing, Electrical, City Planning and Fire Codes, and any other applicable code regulations."On September 21, 1990, eight days after the warrant issued, Inspector Albert Chinn of the Public Health Department wrote to Quade, advising that Chinn had an inspection warrant; that he would inspect Quade's property on September 28; and that Quade would be required to be there. Chinn also stated that if Quade failed to allow inspection, he would obtain a forcible entry warrant. Chinn invited Quade to contact him to set a different date if more convenient.
 
 
 9
 Quade did not respond. Nor did Quade respond to representatives of various other city agencies (e.g., Adult Protective Services, outreach programs) who, alerted by the Health Department, had come to his house to investigate. On September 28, the date of the scheduled inspection, Quade once again failed to come to the door when the inspector appeared.
 
 
 10
 On October 3, 1990, the municipal court judge issued a forcible entry warrant, which authorized entry "for the purpose of discovering if the subject property complies with the Health, Building, Housing, Plumbing, Electrical, City Planning and Fire Codes, and any other applicable code regulations." The warrant also provided that "[s]aid inspection may be made by means of forcible entry." The warrant was issued pursuant to Cal.Code Civ.Proc. Sec. 1822.56, which provides in pertinent part that
 
 
 11
 [a] judge may expressly authorize a forcible entry where facts are shown sufficient to create a reasonable suspicion of a violation of a state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning ... [and] where facts are shown establishing that reasonable attempts to serve a previous warrant have been unsuccessful. Where prior consent has been sought and refused, notice that a warrant has been issued must be given at least 24 hours before the warrant is executed.
 
 
 12
 In compliance with the latter provision, Chinn wrote to Quade on October 10, 1990, advising him that an inspection had been scheduled for October 16, 1990, and that Chinn had obtained a forcible entry warrant.
 
 
 13
 On October 16, Public Health officials returned to Quade's house to execute the forcible entry warrant, this time accompanied by Sgt. Heller of the San Francisco Police Department. Sgt. Heller, finding that Quade's door had been nailed shut, moved aside a piece of cardboard covering a window. Quade called from inside "I'm going to get my gun and use it." The sergeant then radioed for reinforcements. A tactical team arrived, as well as a team of hostage negotiators. Representatives of the various city agencies which had become involved in Quade's case were on the scene as well. The hostage negotiators by this time had learned that Quade was mentally unstable, elderly (they believed him to be 70), overweight, and "half-blind."
 
 
 14
 The police cordoned off the area around Quade's house, and a member of the hostage negotiating team tried to talk to Quade. Quade did not respond. After nearly an hour, defendant Captain Willett formulated a plan to enter the house and take Quade into custody; he had been ordered to do the latter by Commander Lennon. Two officers on the tactical squad broke down the door with a battering ram; seven others entered the house. Five of the seven entered with guns drawn; two did not have their guns drawn, one because he was holding a shield. Quade appeared on top of the staircase holding a .22 caliber handgun. The police ordered him to drop the gun; rather than doing so, however, he said "I told you I was going to use it," and pulled the trigger. The officers shot back, and Quade died from gunshot wounds shortly thereafter. His own gun had apparently misfired, and none of the officers was hurt.
 
 
 15
 After Quade had been taken to the hospital, the health inspectors came in. They found the house filled with garbage, rotting food, and excrement.
 
 
 16
 Outside the house, Captain Hettrich, one of the defendants, gave the following statement to the press:
 
 
 17
 It wasn't necessarily dangerous but we could have been waiting all day long. The man was just unresponsive to any of our demands, any of our requests. And with the hostage negotiators and myself it appeared that he was not going to respond and uh we felt that rather than keep traffic blocked up and the streets blocked all day long we would try to go in and arrest him.
 
 B. Procedural Background
 
 18
 This action was brought under 42 U.S.C. Sec. 1983 by Julia Alexander, executor of Quade's estate, against 16 members of the San Francisco Police Department and the City and County of San Francisco.[1] Plaintiff moved for summary judgment in her favor on her first theory of liability under Sec. 1983: unlawful entry to effect an arrest. Defendants filed a cross-motion for summary judgment on all claims. In an order dated September 3, 1992, the district court denied plaintiff's motion for summary judgment and granted defendants' motion on the unlawful entry issue, holding that no arrest had been made, that even if there had been a wrongful arrest, defendants were entitled to qualified immunity, and that even if they were not immune, they were entitled to summary judgment on the merits because they were in possession of a lawful administrative inspection warrant.
 
 
 19
 In an order dated September 11, 1992, the district court granted summary judgment for defendants on plaintiff's second theory of liability. The court held that the officers were entitled to qualified immunity on plaintiff's excessive force claim because their entry into the house was lawful, and because even though it may have been more intrusive than other ways of dealing with Quade, there was no clearly established law requiring the officers to choose any particular method among an array of available tactics. The court also held that because the individual officers were entitled to summary judgment on the basis of qualified immunity, there could be no municipal liability under Monell v. Department of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants concede that the court's stated basis for this latter ruling was incorrect under Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), but argue that the ruling can be sustained on other grounds.
 
 
 20
 Plaintiff appeals both of the rulings. Her appeal is limited to four defendants: Commander Lennon, who was in charge of the October 16 operation; Captain Hettrich, the "Event Commander," Captain Willett, the "Tactical Commander," and the City and County of San Francisco.
 
 DISCUSSION
 
 21
 The district court had jurisdiction over plaintiff's Sec. 1983 claim under 28 U.S.C. Secs. 1331 & 1343. We have jurisdiction under 28 U.S.C. Sec. 1291. We review the district court's summary judgment rulings de novo, Jones v. Union Pacific R.R., 968 F.2d 937, 940 (9th Cir.1992), and we may affirm on any ground supported by the record. In re Apple Computer Secs. Litig., 886 F.2d 1109, 1112 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989).
 
 
 22
 A. Dismissal of Appeal as to Certain Defendants
 
 
 23
 Defendants state in a footnote that the appeal should be "dismissed" against Captains Hettrich and Willett because Commander Lennon, and not the captains, ordered the entry into Quade's house. Capt. Willett, however, testified that "the method that was utilized to [e]ffect entry and take [Quade] into custody was my decision." CR-75 ex. M, dep. at 228. Capt. Hettrich, when asked whether he had anything to do with the decision-making process, replied "I was acting as an advisor relaying information from the hostage negotiating team to Commander Lennon." CR-75 ex. W, dep. at 81. Capt. Hettrich is also listed on a police report as the "Event Commander." This evidence creates at least a dispute of fact as to whether the captains were responsible for the conduct at issue in this lawsuit.
 
 B. Entry Without an Arrest Warrant
 1. Plaintiff's substantive argument
 
 24
 The gist of plaintiff's first theory is that Quade's Fourth Amendment rights were violated when the officers on the tactical squad entered his house to arrest him without an arrest warrant. Plaintiff relies on Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980), in which the Supreme Court held that absent exigent circumstances, police may not enter a suspect's home to make a felony arrest without a warrant.
 
 
 25
 Defendants argue that they are entitled to summary judgment on plaintiff's "Payton" theory because they had a warrant: they were assisting the Health Department in executing its forcible entry inspection warrant, and hence were acting under the authority conveyed by that warrant. Defendants argue that there is absolutely nothing unlawful about this.
 
 
 26
 Defendants cite no federal law dealing with California's forcible entry statute. Instead they rely on People v. Tillery, 211 Cal.App.3d 1569, 260 Cal.Rptr. 320 (1989), in which the California Court of Appeal simply assumed that police officers may execute, or in any event assist in executing, forcible entry inspection warrants. The Tillery court stated that the 24-hour notice provision of Cal.Code Civ.Proc. Sec. 1822.56 was "designed to preven[t] a violent confrontation between the police and the occupier of the premises to be inspected." Id. 260 Cal.Rptr. at 324 (emphasis added).[2]
 
 
 27
 In response, plaintiff argues that the officers had the wrong kind of warrant, or, what amounts to the same thing, that they exceeded the scope of the warrant they had. Plaintiff argues that the officers entered the house for the purpose of arresting Quade, while the purpose of the warrant, by its own terms, was to enable the inspectors to determine whether the property complied with various health and building codes. This substitution of purpose, plaintiff argues, violates the particularity requirement of the Fourth Amendment,[3] and runs afoul of those cases which hold that administrative searches may not be converted into tools for law enforcement officials with goals different from those of the agency authorized to conduct the search.
 
 
 28
 We agree with plaintiff that if in fact the officers' primary purpose in storming the house was to arrest Quade rather than to assist the health officials in executing the inspection warrant, then Quade's Fourth Amendment rights were violated. In Michigan v. Clifford, 464 U.S. 287, 294, 104 S.Ct. 641, 647, 78 L.Ed.2d 477 (1984), the Supreme Court held that arson investigators, even if authorized to conduct an administrative search into the cause of a fire, violated the Fourth Amendment when instead their primary purpose was to search for evidence of arson. Id. at 297-98, 104 S.Ct. at 648-49.[4] In United States v. $124,570 U.S. Currency, 873 F.2d 1240 (9th Cir.1989), we employed the same approach. Citing Camara v. Superior Court, 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967), Wyman v. James, 400 U.S. 309, 323, 91 S.Ct. 381, 388-89, 27 L.Ed.2d 408 (1971), and Abel v. United States, 362 U.S. 217, 230, 80 S.Ct. 683, 692-93, 4 L.Ed.2d 668 (1960), we concluded that "[t]he Supreme Court has repeatedly emphasized the importance of keeping criminal investigatory motives from coloring administrative searches." 873 F.2d at 1244. Accordingly, we held that a claimant's Fourth Amendment rights had been violated when a search conducted by a private airport security company looking for weapons was co-opted by law enforcement agents looking for large amounts of currency associated with drug couriers.
 
 
 29
 These cases make it very clear that an administrative search may not be converted into an instrument which serves the very different needs of law enforcement officials. If it could, then all of the protections traditionally afforded against intrusions by the police would evaporate, to be replaced by the much weaker barriers erected between citizens and other government agencies. It is because the missions of those agencies are less patently hostile to a citizen's interests than are the missions of the police that the barriers may be as weak as they are and still not jeopardize Fourth Amendment guarantees. See Camara, 387 U.S. at 537, 87 S.Ct. at 1735 (approving administrative searches as reasonable in part because "the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, [and hence] involve a relatively limited invasion of the urban citizen's privacy") (quoted in $124,570, 873 F.2d at 1244). When the mission of the agency is supplanted by the more antagonistic purposes associated with traditional law enforcement operations, greater protection is required.
 
 
 30
 Plaintiff argues that all that stood between Quade and a police force intent on his capture was the judgment of a municipal court judge asked to provide authority for sewage abatement, not arrest. We agree that this protection was not sufficient. Without an arrest warrant, and without exigent circumstances, the police had no right to enter Quade's house for the primary purpose of arresting him. The inspection warrant was just that: an inspection warrant.
 
 
 31
 We cannot agree with Judge Trott that "[n]o legitimate Fourth Amendment purpose is served by forcing the police to go back, yet a third time, to get an arrest warrant." Dissent at 1372. The Health Department officials had an administrative warrant to inspect, nothing more. The purpose which would have been served if the police had secured an arrest warrant was compliance with the Fourth Amendment's particularity requirement, and with those cases from the Supreme Court and our circuit which prohibit police or other officials from using the authority to conduct administrative searches for law enforcement purposes. Had the police obtained a "third warrant," they would have obtained the sanction of a judicial officer to make the arrest--as they were required to do--rather than making an arrest in the home pursuant to their own assessment of the situation and their own interpretation of their authority to intrude. The Fourth Amendment, as the Supreme Court held in Payton, mandates as much.[5]
 
 
 32
 Defendants take a different tack, and argue that the officers' primary purpose in storming the house was not in fact to arrest Quade. But while one of the commanding officers, Capt. Hettrich, testified that no decision to arrest Quade was made prior to entry, CR-75 ex. W, dep. at 82, Capt. Willett testified that "[Commander Lennon] informed me that he would like me to go ahead and take over the operation and to [e]ffect an arrest on Mr. Quade."[6] CR-75 ex. M, dep. at 238. Similarly, a police report prepared by Sgt. David Shinn, one of the leaders of the tactical squad, states that Lt. Joaquin Santos (also of the tactical squad) advised him before entering Quade's house that "our mission was to take the suspect into custody." CR-51 ex. 1 at 3. On summary judgment, we must construe the disputed facts in favor of the nonmoving party, and therefore we must assume that Capt. Willett's and Sgt. Shinn's descriptions of the officers' purpose are correct.
 
 
 33
 We are not persuaded by the proposition, advanced by defense counsel at oral argument, that when police officers use the term "arrest" they in fact mean only the temporary "detention" incident to search which may be effected without an arrest warrant or probable cause to arrest.[7] We are entirely unwilling to conclude that as a matter of law a police captain does not know the difference between an arrest and a detention. Counsel is free to make this argument to a jury. But neither the facts nor the law support defendants' bid for summary judgment.
 
 
 34
 Additional issues raised by defendants, or by the district court's order, reveal that this case can't be dealt with in summary fashion. We address the remaining points seriatim.
 
 2. The effect of the right to detain
 
 35
 Defendants argue that any detention of Quade incident to the execution of the inspection warrant was justifiable, and that somehow this justification embraces the right to arrest as well. Defendants rely on Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), where officers in possession of a search warrant encountered defendant leaving his house as they approached to execute the warrant; the officers detained defendant while searching the premises, and after finding drugs in the house, searched defendant and found more drugs on his person. The Court held that the detention of the defendant incident to the search was lawful.
 
 
 36
 The dispositive fact in Michigan v. Summers was "that the police had obtained a warrant to search respondent's house for contraband." 452 U.S. at 701, 101 S.Ct. at 2593. From that fact, the Court drew various conclusions about the incidental detention of the defendant. First, the detention was "surely less intrusive than the search itself," since "most citizens ... would elect to remain in order to observe the search of their possessions." 452 U.S. at 701, 101 S.Ct. at 2593. Second, the detention "is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." Id. Third, the existence of a search warrant "provides an objective justification for the detention," because "[a] judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime." Id. at 703, 101 S.Ct. at 2594. Fourth, the detention may be necessary to facilitate execution of the search warrant--by preventing flight if incriminating evidence is found, and by protecting the officers while they conduct the search. Id. at 702-03, 101 S.Ct. at 2594-95.
 
 
 37
 Many of these observations simply do not hold true when the underlying warrant is an administrative warrant rather than a criminal search warrant.[8] First, citizens may well find it much more intrusive to be detained than to have their houses inspected for possible noncompliance with health and building codes. Second, there is no assurance here that the police would lack incentive to gain more information through observing or questioning the owner of the place to be inspected; indeed, one of the officers testified that "[w]e went in to evaluate Mr. Quade.... if there's something to arrest him for, we would have done that." CR-75 ex. P, dep. at 126 (emphasis added). Third, where the underlying warrant is administrative, there will have been no determination by a judicial officer "that someone in the home is committing a crime." While in this case plaintiff concedes that Quade was guilty of a crime, this will not always necessarily be so, and in any event, a post-incident determination that a crime was committed is no substitute for a pre-seizure determination by a judicial officer. The only rationale offered in Summers which might apply to this case is the fourth: detention of the occupant is authorized if necessary to facilitate execution of the inspection warrant and to protect the safety of both the inspectors and the officers.
 
 
 38
 Summers held that officers searching for contraband have "limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705, 101 S.Ct. at 2595 (emphasis added). Applied in the administrative context, this amounts to nothing more than what the California Court of Appeal assumed was authorized in Tillery: law enforcement assistance in executing an inspection warrant. We do not disagree that rendering such assistance may be appropriate, and may also be constitutional. What plaintiff argues, however, and what she supports with citations to the record, is that the officers intended much more than a limited and purely incidental detention. She argues that the officers' purpose had shifted from assisting in the execution of the warrant to arresting Quade. The reports and the testimony of the officers who were involved support that assertion. Summers does not authorize officers in possession of an administrative inspection warrant to go into a house for the purpose of arresting its occupant. Defendants' reliance on the case is therefore misplaced.
 
 3. Qualified immunity
 
 39
 Defendants argue that they are entitled to summary judgment based on qualified immunity. Government officials such as police officers are not absolutely immune from suit, but rather are immune only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1992). The determination of qualified immunity
 
 
 40
 necessitates three inquiries: (1) the identification of the specific right allegedly violated; (2) the determination of whether that right was so "clearly established" as to alert a reasonable officer to its constitutional parameters; and (3) the ultimate determination of whether a reasonable officer could have believed lawful the particular conduct at issue.
 
 
 41
 Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir.1991) (citations omitted).
 
 
 42
 Defendants argue that they are entitled to qualified immunity because Quade had "no clearly established constitutional or statutory right ... not to have police officers accompany health inspectors executing a forcible entry warrant," and because "Commander Lennon could not have known that he was violating Quade's rights by ordering the officers to enter to make the premises safe." Br. of Appellees at 12. This misstates the inquiry, however. Plaintiff argues that police officers entered Quade's house not for the purpose of making the premises safe, but rather primarily for the purpose of arresting Quade. If that is the purpose, clearly established law requires an arrest warrant, and also prohibits the conversion of an administrative warrant into an all-purpose tool in the hands of law enforcement authorities. Defendants have not shown that a reasonable officer could have believed that entry with intent to arrest would not violate clearly established law. Thus summary judgment on the basis of qualified immunity would be inappropriate if the intent was to arrest or if facts as to intent are in dispute.
 
 
 43
 A genuine dispute exists as to whether or not defendants ordered the storming of the house primarily for the purpose of arresting Quade. The fact that this dispute turns on an essentially subjective element (the officers' purpose), while qualified immunity involves an inquiry into "objective reasonableness" does not mean that qualified immunity is any more or less available in this context than it would otherwise be. See Branch v. Tunnell, 937 F.2d 1382, 1385 (9th Cir.1991) (Branch I ) (recognizing the "tension" between Harlow's emphasis on objective reasonableness and the subjective elements which are at times at issue in lawsuits against public officials, including lawsuits based on alleged Fourth Amendment violations);[9] Sloman v. Tadlock, 21 F.3d 1462, 1468-69 (9th Cir.1994). In short, the factual issues in this case must be decided by a jury before any determination of qualified immunity can be made.
 
 
 44
 Our decision in Act Up!/Portland v. Bagley, 988 F.2d 868 (9th Cir.1993), is not contrary. In the context of a case which turned on whether reasonable suspicion existed, we held that where the underlying facts are undisputed, the court must rule on qualified immunity at summary judgment. Id. at 873. Whether or not a reasonable officer would have known that his or her conduct violated clearly established law "is not in itself a factual issue that can preclude summary judgment." Id. We also held, however, that "[if] a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial." Id. Here, such a dispute exists.
 
 4. Lack of formal arrest
 
 45
 The district court considered at length whether Quade was ever formally arrested, and its summary judgment ruling attaches some significance to its conclusion that even if the police cordon which was formed around Quade's house was "formed for the purpose of accomplishing an arrest ... [t]he act itself, without a subsequent custodial taking, is not an arrest." District Court Order of September 3, 1992, at 8. We do not decide whether or not forming a cordon constituted a seizure. In our view, whether it did or not is irrelevant. The actions of those defendants against whom plaintiff is pursuing her appeal did not end with the formation of the cordon. Defendants are alleged to have been part of the command structure which ordered the storming of the house. There can be no question but that the shooting of Quade, which followed from the storming, constituted a seizure. Tennessee v. Garner, 471 U.S. 1, 9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985) (use of deadly force against a suspect is a seizure within the meaning of the Fourth Amendment); see also Brower v. Inyo County, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (same).[10]
 
 
 46
 The issue in its most simplistic form is whether defendants did something wrong that resulted in Quade's death. We recognize that this is hardly a traditional wrongful arrest case. In the typical case, where the Sec. 1983 plaintiff is formally arrested, he shows at trial that the police failed to comply with Fourth Amendment standards in taking him into custody, and his damages turn on the inconvenience and humiliation he suffered from the arrest. Here, there is none of this kind of indignity, only death.
 
 
 47
 The causal link between the alleged wrongdoing on which plaintiff's case depends (entry for the purpose of making an arrest) and the injury suffered (not arrest but death) is somewhat more subtle here than in the typical case. At first glance, it may appear that it was the entry itself, rather than the purported unlawfulness of the officers' purpose, which precipitated Quade's death. But assuming for purposes of summary judgment that the officers' purpose was unlawful, we need to keep in mind that we simply do not know how matters would have turned out if the officers had entered solely for the purpose of inspection. At trial, plaintiff's argument might run something like this: if the officers' purpose had been what it should have been (to assist the public health officials in serving the warrant), their manner of entry would have been different, and might in turn have evoked a different response from Quade--a response which would not have led to an armed standoff and ultimately to death.
 
 
 48
 Alternatively, plaintiff might argue that if the police had halted their activities and then gotten an arrest warrant, this too might have avoided the final tragic confrontation. Given the delay attendant in obtaining the warrant, the police might well have sent the gathered city officials away, and then, without the pressure of their presence, and without the expectation that an inspection could be conducted any time soon, might have allowed events to unfold more slowly. Plaintiff could argue, in other words, that it was the purpose of arrest or indeed the combination of purposes--health inspection plus arrest--which led to such fatal consequences. This theory of causation, in fact, follows more or less precisely from plaintiff's theory of misconduct, which is that the officers improperly overlaid the administrative purposes of the inspection warrant with law enforcement purposes of their own.
 
 
 49
 In sum, we conclude that with respect to plaintiff's unlawful entry theory, defendants are not entitled to summary judgment on any of the grounds set forth in their brief or in the district court's order.[11]C. Excessive Force
 
 
 50
 It is important to understand exactly what plaintiff claims. She argues that it was unreasonable for the officers to storm the house of a man whom they knew to be a mentally ill, elderly, half-blind recluse who had threatened to shoot anybody who entered. Plaintiff does not argue that once Quade pointed his gun at the officers and pulled the trigger, the officers used unreasonable force in shooting to kill. Rather, plaintiff argues that defendants used excessive force in creating the situation which caused Quade to take the actions he did.[12] She also takes pains to explain on appeal that her excessive force claim has never been premised solely on the argument that the force used by the officers was unreasonable because the officers failed to exhaust less intrusive alternatives.[13] In essence, her claim is that Quade's Fourth Amendment rights were violated because the force the police used was unreasonable under all of the circumstances.
 
 
 51
 Plaintiff's claim, if supported by the evidence, states a classic Fourth Amendment violation under Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872-73, 104 L.Ed.2d 443 (1989). There, the Supreme Court held that a police officer's use of force in apprehending a suspect violates the Fourth Amendment if it is unreasonable in light of the facts and circumstances confronting the officer. Those circumstances, under both Graham and the excessive force cases from this circuit, include " 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " Hopkins v. Andaya, 958 F.2d 881, 885 (9th Cir.1992) (per curiam) (quoting Graham, 490 U.S. at 396, 109 S.Ct. at 1871-72).
 
 
 52
 Summary judgment is inappropriate, since whether the officers entered for the purpose of arresting Quade or for the purpose of assisting in the execution of the inspection warrant is in contention, as is the reasonableness of the force. The force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the consideration of the Graham factors. If the jury were to find that the officers entered in order to help the inspectors inspect--as defendants contend on appeal--then the jury may also conclude that the force used (deployment of a SWAT team) was excessive in relation to the purpose for which it was used (ensuring the immediate execution of a forcible entry inspection warrant). On the other hand, if the jury were to conclude that the officers entered for the purpose of arresting Quade, they may conclude that storming the house was in fact commensurate with need (arresting a man who had threatened to shoot anyone who came into his house), and hence that the force was reasonable.
 
 
 53
 We conclude that the dispute as to the facts precludes summary judgment for defendants both on the merits and on defendants' qualified immunity claim. See Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir.1993); Act Up!, 988 F.2d at 873; Hopkins, 958 F.2d at 885 n. 3.
 
 D. Municipal Liability
 
 54
 Under Monell v. Department of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978), a municipality may be liable under Sec. 1983 "only if its policy or custom caused the constitutional deprivation complained of." Mateyko v. Felix, 924 F.2d 824, 826 (9th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991) (citing Monell ). Plaintiff attempts to tie the acts of the individual defendants to a custom or policy of the City and County of San Francisco in two separate ways. We reject both.
 
 1. Inadequate training
 
 55
 First, plaintiff argues that the municipality was responsible for Quade's injuries because it failed to train Commander Lennon adequately in the proper response to "barricaded subject situations" and in the proper procedures for arresting suspects in their homes. "[T]he inadequacy of police training may serve as the basis for Sec. 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). Although "[w]hether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury," Oviatt v. Pearce, 954 F.2d 1470, 1478 (9th Cir.1992), we conclude that in this case the municipality is entitled to summary judgment.
 
 
 56
 In those cases where we have held that a question of fact existed as to the deliberately indifferent character of a municipality's failure to train, plaintiffs have alleged a program-wide inadequacy in training. Davis v. Mason County, 927 F.2d 1473, 1483 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991); Reed v. Hoy, 909 F.2d 324, 331 (9th Cir.1989), cert. denied, 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1053 (1991). Here, by contrast, plaintiff argues only that the training of Commander Lennon was inadequate. She has produced no evidence showing that the alleged inadequacy of his training was the result of a "deliberate" or "conscious" choice, which, under Canton, is necessary to establish a municipal policy. 489 U.S. at 389, 109 S.Ct. at 1205; see also Ting v. United States, 927 F.2d 1504, 1512 (9th Cir.1991). Absent such evidence, any shortfall in Lennon's training can only be classified as negligence on the part of the municipal defendant--a much lower standard of fault than deliberate indifference.
 
 
 57
 The deliberate indifference standard was specifically adopted by the Supreme Court in order to ensure that civil rights claims against municipalities attain a certain level of gravity before those entities are compelled to defend themselves at trial. Canton, 489 U.S. at 391-92, 109 S.Ct. at 1206-07. Much of that assurance would be removed if plaintiffs could proceed to trial against a municipality on the basis of the failure to train a single officer, and without any showing that this failure was the result of a conscious or deliberate choice. By limiting her proof to the adequacy of the training of a single officer, plaintiff has failed to create a genuine issue of fact as to the alleged deliberate indifference of the municipality.
 
 
 58
 Plaintiff also argues that the deposition testimony of Sgt. Stasko reveals that Lennon's actions were "in accordance with San Francisco Police Department training." Reply Br. at 22. Possibly this testimony, if further developed, would reveal the type of department-wide inadequacy of training missing from plaintiff's proof.
 
 
 59
 However, Stasko's deposition was not presented to the district court because it had not yet been taken when the summary judgment motion was heard. Plaintiff does not explain why she could not have taken Stasko's deposition in a timely fashion. Consequently, we do not consider it. In Hopkins, where "appellants offer[ed] no excuse for not presenting [an] affidavit earlier," we refused to consider the affidavit, explaining that "[a] defeated litigant cannot set aside a judgment because he failed to present on a motion for summary judgment all the facts known to him that might have been useful to the court." 958 F.2d at 887 n. 2. Although here the facts revealed by Stasko may not have been known to plaintiff at the relevant time, plaintiff's failure to explain why she could not have learned of those facts sooner is fatal. We follow Hopkins, and do not consider Stasko's testimony.
 
 2. Acts of a policymaker
 
 60
 Plaintiff also suggests that regardless of Lennon's training, his acts may give rise to municipal liability in and of themselves because Lennon's high rank enabled him to establish municipal policy. In Pembaur v. Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986), the Supreme Court held that where "[a] decision to adopt [a] particular course of action is properly made by [a] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." Plaintiff, however, cites neither facts nor law showing that a San Francisco police commander is an authorized decisionmaker for the City and County of San Francisco. We therefore reject this argument.
 
 
 61
 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 
 
 62
 KOZINSKI, Circuit Judge, concurring.
 
 
 63
 I join Judge Fletcher's thorough and thoughtful opinion but add a few words to emphasize what I see as the key issue in this case. Assuming, as we must, that the police conducted their raid on Quade's house in order to arrest him on suspicion of a crime, it was clearly established that they needed a warrant. Michigan v. Clifford, 464 U.S. 287, 297-98, 104 S.Ct. 641, 648-49, 78 L.Ed.2d 477 (1984); Payton v. New York, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980).
 
 
 64
 No exigency stood in the way of seeking a warrant. Cf. Michigan v. Clifford, 464 U.S. at 292-93, 104 S.Ct. at 646-47; Michigan v. Summers, 452 U.S. 692, 702, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981). The suspect was encircled and was no threat to anybody. Keeping the house blockaded long enough to apply for a warrant would have been a nuisance but, as best the record discloses, posed no danger to the community. See Maj.Op. at 1365 n. 11.
 
 
 65
 And seeking a warrant could have made a difference here. I seriously doubt a reasonable judicial officer would have authorized the immediate storming of Quade's residence by a heavily armed tactical team. Instead, he might have required exhaustion of less intrusive alternatives, like using tear gas or waiting Quade out. See, e.g., Paul Pringle & Shante Morgan, O.J. Surrenders: Bizarre Chase Ends in Standoff at Estate, San Diego Union-Trib., June 18, 1994, at A1. Or, perhaps the judge would have concluded that, if entry for purposes of a health inspection could only be achieved by the use of shock troops, it wasn't worth the risk to life and property. Quade, after all, was a half-blind recluse, an eccentric, perhaps in need of medical attention--not David Koresh.
 
 
 66
 Under Payton, the potentially fatal decision to confront a suspect within his own home is taken away from those on the scene, whose judgment may be clouded by an understandable, but perhaps misguided, sense of urgency. What is striking about the fact pattern here is the massive disproportionality of the response to the problem of a leaky sewer pipe. I would like to believe that, had Payton been followed, the judicial officer from whom the warrant was sought would have injected a measure of objectivity and detachment, perhaps saving Quade's life. By failing to take this constitutionally-required step, the officers short-circuited the built-in safeguard of the warrant requirement, costing Quade his life and exposing themselves to liability.
 
 
 67
 TROTT, Circuit Judge, concurring in part and dissenting in part:
 
 
 68
 I respectfully disagree with the majority's analysis of the constitutional propriety of the police's conduct in this case. Mr. Quade's death was tragic, but that tragedy is only compounded by forcing police officers to stand trial when their actions were clearly reasonable. At the very least, they are surely entitled to qualified immunity. My main concern, however, is that the majority's opinion not only misapplies, but literally wreaks havoc on the Fourth Amendment and the law covering forcible inspection warrants.[1]
 
 
 69
 * A. The majority fails to appreciate the significance of the magistrate's issuance of a forcible entry inspection warrant. Actually, the City applied for and obtained not one, but two administrative inspection warrants for Mr. Quade's premises before they set foot in his house.
 
 
 70
 The first warrant (No. 90-5), properly supported by a declaration from a public health inspector and prepared by a deputy city attorney, was secured from the San Francisco Municipal Court on September 13, 1990. The inspection warrant states:
 
 
 71
 YOU ARE THEREFORE COMMANDED on September 19, 1990, or as soon thereafter as practicable, but no later than September 28, 1990, between the hours of 8:00 a.m. and 5:00 p.m. to arrange and conduct a complete inspection of the said premises by and through all appropriate inspectors for the City and County of San Francisco, for the purpose of discovering if the subject property complies with the Health, Building, Housing, Plumbing, Electrical, City Planning and Fire Codes, and any other applicable code regulations. Said inspection may not be made by means of forcible entry.
 
 
 72
 (emphasis added). Three aspects of this court order are noteworthy. First, the City secured the warrant only after receiving public complaints about malodorous sewage and garbage in and about Mr. Quade's house, sending health inspectors on numerous occasions to his house, and posting multiple notices on his front door. The City even sent a public health nurse on two occasions to evaluate Mr. Quade's health. He did not respond. The City's actions failed to abate the problem, and neighbors continued to complain about sewage flowing from Quade's house onto their property. Second, the warrant and its supporting documentation comply in all respects with the letter of the law. Third, forcible entry, although not requested, was explicitly prohibited. This inspection warrant represents a measured, reasonable, legal response by both the City and the magistrate to months of intransigence by Mr. Quade. Mr. Quade's intransigence perpetuated a sewage problem that, according to the health inspector, "presented immediate public health problems in the form of possible enteric and respiratory diseases."
 
 
 73
 The City then notified Mr. Quade in writing of the existence of this first warrant and gave him seven days to prepare for an inspection scheduled for the 28th of September. He was told to call the City's Principal Health Inspector to arrange a different date if the one set by the City was undesirable. The City never received a response.
 
 
 74
 On September 28, Mr. Quade was either not present or did not answer the door, thwarting the commanded service of the inspection warrant. Dutifully, Inspector Chin returned to the Municipal Court, again accompanied by a deputy city attorney. This time he requested a new inspection warrant authorizing "forcible entry." He based this request on the owner's manifest refusal to cooperate with the City and to honor the first inspection warrant. The request by the City for forcible entry was absolutely proper and appropriate. California law specifically provides for such requests: "An inspection pursuant to a warrant shall not be made by means of forcible entry, except ... where facts are shown establishing that reasonable attempts to serve a previous warrant have been unsuccessful." Cal.Civ.Proc.Code Sec. 1822.56 (West 1982).
 
 
 75
 Consequently, Judge Mallen issued a second inspection warrant (No. 90-6) for Mr. Quade's premises "commanding a timely search between October 9, 1990 and October 16, 1990." The warrant explicitly stated that the commanded inspection "may be made by means of forcible entry." (emphasis added). This provision is beyond legal reproach. The City then advised Mr. Quade by mail of the existence of this second warrant. A copy of the warrant itself was included in the mailing, and the inspection was set for October 16, 1990. Notwithstanding Mr. Quade's intransigence, the City continued to respect his privacy.
 
 
 76
 This is the situation in which the City found itself on October 16, 1990, the day of the fatal shooting. Twice the City had taken its case before a neutral magistrate. The City had incrementally secured not only one but two inspection warrants for Mr. Quade's premises. A magistrate had ordered that Quade's privacy interest yield to the public's legitimate interest in health and safety. After making an adequate showing under the proper statute, the City had been given explicit judicial authority for forcible entry based on reasonable but unsuccessful attempts to serve the first warrant. The second warrant was legally as sound as the first, authorizing the City to breach Mr. Quade's privacy and inspect the interior of his house.
 
 
 77
 In my view, the clearly established law at the time of the entry of Mr. Quade's premises authorized the City under these circumstances to secure the assistance of the police to keep the peace during the service of this forcible entry warrant. Such a proposition would seem to be beyond debate, and I can find no case indicating to the contrary. What is a police department for if not to keep the peace during the service of a forcible entry warrant?
 
 
 78
 People v. Tillery, 211 Cal.App.3d 1569, 260 Cal.Rptr. 320 (1989), is a California case embracing this proposition. In Tillery, the building inspectors and the assisting deputy sheriffs had an inspection warrant, but unlike the warrant in this case, it did not authorize forcible entry. When they tried to serve it, they were met with resistance by the landowner. Under those circumstances, the Tillery court prescribed the following:
 
 
 79
 [O]nce appellant had explicitly refused to consent to the inspection, the authority to execute the warrant ended. At this point, the officers had no right to force appellant out of his car and back to the gate to open it so the officers could get onto the premises. Under the statutory procedures mandated for administrative inspections, the officers' only alternative once appellant refused to accept the warrant or to otherwise consent to the inspection of the premises was either to allow appellant to go on his way or to arrest him for willful refusal to permit an inspection lawfully authorized by the warrant, a misdemeanor under section 1822.57. The latter option would have justified the officers' placing appellant in the patrol car and taking him to the station for booking on the misdemeanor. To continue the search by any forceful means, however, required another warrant containing a judge's specific authorization of a forcible entry of the premises.
 
 
 80
 Id. 260 Cal.Rptr. at 324 (emphasis added). Thus, California law encouraged the City and the police to do exactly what they did--secure a forcible entry inspection warrant and have the police accompany the inspector.
 
 
 81
 The controlling law clearly also permitted the police to seize and detain, if necessary, the occupant of a house so that a forcible entry inspection warrant could be peacefully served and the house searched, especially when the predicate for the approval of forcible entry is the occupant's apparent resistance to previous attempts at entry and inspection. As authority for this wholly intuitive proposition, I rely on Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595-96, 69 L.Ed.2d 340 (1981): "[F]or Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."
 
 
 82
 Summers, of course, involved a criminal search warrant which was issued based on a showing of probable cause to believe the residence to be searched contained contraband. This difference raises the question of whether the occupant-detention principle confirmed by the Court in Summers applies only to criminal warrants, or whether it also applies to forcible entry inspection warrants. The answer based on the Court's reasoning in Summers surely is that the occupant-detention principle applies to both situations. In each case, a
 
 
 83
 neutral and detached magistrate will have authorized a substantial invasion of the privacy of the persons who reside there. The detention of one of the residents while the premises [are] searched, although admittedly a significant restraint on his liberty, [is] surely less intrusive than the search itself. Furthermore, the type of detention imposed ... is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention.
 
 
 84
 Id. at 701, 101 S.Ct. at 2593 (footnotes omitted).
 
 
 85
 Moreover, the Court provided this instructive language in Summers, language that seems equally as applicable to forcible inspection warrants as it does to criminal warrants for contraband:
 
 
 86
 Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.
 
 
 87
 Id. at 702-03, 101 S.Ct. at 2594 (emphasis added) (footnote omitted).
 
 
 88
 The logic and common sense of the Supreme Court's statement applies four square to the situation the health inspectors and the officers confronted in this case. The forcible execution of an inspection warrant issued after an occupant has refused entry is precisely the "kind of transaction that may give rise to sudden violence." Id. at 702, 101 S.Ct. at 2594. Accordingly, "the risk of harm to both the police [and the health inspectors] and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. at 702-03, 101 S.Ct. at 2594. Under the circumstances therefore, the fact that Summers involved a criminal search warrant, whereas the instant case involves a forcible entry inspection warrant, is irrelevant. To hold otherwise would be to be blinded by form over reason and substance. The need-based principle permitting and encouraging the police to keep the peace is sound in both settings.
 
 
 89
 The police's withdrawal to a position of safety and call for mental health experts hardly renders their behavior unreasonable. District Judge Jensen's insight into this situation is correct:
 
 
 90
 Plaintiff would have the Court conclude that, because the officers retreated rather than entered immediately to ensure the premises were safe for inspection, the officers somehow converted their legal right to enter into an unlawful arrest. Such a decision would encourage police officers to act impulsively to preserve their lawful right of entry, rather than carefully to ensure the safety of the officers, the occupants, and the inspection officials.
 
 
 91
 Nevertheless, the majority concludes that if the police entered Mr. Quade's house for the primary purpose of arresting him, their entry was unlawful because they didn't have an arrest warrant. Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), however, does not compel that result. In Payton, the Court held, absent exigent circumstances or any kind of warrant issued by a neutral magistrate, the police may not enter a suspect's home to make an arrest. The Court based its holding on the principle that " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " Id. at 585, 100 S.Ct. at 1379-80 (quoting United States v. United States Dist. Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134-35, 32 L.Ed.2d 752 (1972)); see also Summers, 452 U.S. at 701, 101 S.Ct. at 2593-94. The arrest warrant serves this goal by "interpos[ing] the magistrate's determination of probable cause between the zealous officer and the citizen." Payton, 445 U.S. at 602, 100 S.Ct. at 1388.
 
 
 92
 Here, the City went twice to a magistrate, securing the authority to forcibly enter and inspect Mr. Quade's home. No legitimate Fourth Amendment purpose is served by forcing the police to go back, yet a third time, to get an arrest warrant. A neutral and detached magistrate had already determined that the privacy of Quade's home should be breached--forcibly breached. If "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," the magistrate authorized the invasion of that interest by issuing the forcible entry inspection warrant. Because the police may arrest a felony suspect in a public place without an arrest warrant, the arrest warrant only protects against entry into the home, not arrest. One commentator has concluded, therefore, that "no warrant is needed to arrest if there is another lawful basis for the entry." See 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment Sec. 6.1(c), at 585 (2d ed. 1987). I believe the forcible entry inspection warrant unmistakably provided that legal authority.
 
 
 93
 The majority relies on Michigan v. Clifford, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) and United States v. $124,570 U.S. Currency, 873 F.2d 1240 (9th Cir.1989), to support its contrary conclusion. Two concerns animated those cases. First, administrative searches or warrants are generally subject to less judicial scrutiny than criminal warrants. See, e.g., Camara v. Municipal Court, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735-36, 18 L.Ed.2d 930 (1967) ("[H]ealth official need [not] show the same kind of proof to a magistrate to obtain a warrant as one must who would search for the fruits or instrumentalities of crime."). Second, when criminal investigatory motives are present, the scope of administrative searches may be unnecessarily expanded, increasing the privacy intrusion. See $124,570 U.S. Currency, 873 F.2d at 1245-46 (cooperation policy with U.S. Customs may encourage private airport security personnel "to conduct more searches, and more intrusive searches, than if they focus on air safety alone").
 
 
 94
 Those concerns are not implicated in this case. To issue the forcible entry inspection warrant, the magistrate had to find that "reasonable attempts to serve a previous warrant have been unsuccessful." See Cal.Civ.Proc.Code Sec. 1822.56. Thus, the showing necessary for a forcible entry inspection warrant was very similar to the showing necessary for an arrest warrant for refusal to permit an authorized inspection. See id. Sec. 1822.57. In other words, the forcible entry inspection warrant for Quade's residence, unlike regular inspection warrants, was only issued after a particularized showing that reasonable attempts to serve the previous warrant had been unsuccessful. This procedure forced the magistrate to give special attention to the matter. The heightened judicial scrutiny and individualized showing ensures the forcible entry inspection warrant procedure is more akin to the traditional Fourth Amendment protections of a criminal warrant than the less stringent standards of a regular inspection warrant.
 
 
 95
 More importantly, even if the police intended to arrest Mr. Quade when they entered the residence, there was no danger that the police would improperly expand the scope of their authorized search. In Clifford, a majority of the Court held that arson investigators, even if authorized to conduct an administrative search into the cause of the fire, violated the Fourth Amendment when they searched the upstairs of the house after discovering that the fire started in the basement. See 464 U.S. at 297-98, 104 S.Ct. at 648-49 (plurality opinion); id. at 300, 104 S.Ct. at 650 (Stevens, J., concurring in the judgment). Once the investigators began searching the upstairs, it became clear that they were searching for evidence of criminal activity, not determining the cause and origin of the fire. According to the Court, a criminal search warrant was therefore required. See id. at 294, 104 S.Ct. at 647. Similarly, in $124,570 Currency, we expressed concern that airport security might improperly expand weapon searches if they were rewarded for reporting the detection of drugs or large amounts of currency. 873 F.2d at 1245-46.
 
 
 96
 Here, the forcible entry inspection warrant authorized the City to break down Quade's door and inspect the entire premises for a variety of health and safety violations. Unlike Clifford and $124,570 U.S. Currency, there was no danger that the police would expand the scope of their authorized search if they intended to arrest Quade. The search for Quade could not be more intrusive than a search for health and safety violations, and the police would still need probable cause to arrest. The majority's response is "what is lawful if done for administrative purposes becomes unlawful if done for law enforcement purposes." The majority focuses on the officers' purpose or intent in entering Mr. Quade's residence, but ignores the rationale for Clifford and $124,570 U.S. Currency. The officers' subjective intent is only relevant if it suggests they might expand the scope of the administrative search. An "improper purpose," by itself, does not constitute a Fourth Amendment violation.
 
 
 97
 Furthermore, in neither Clifford nor $124,570 U.S. Currency was any type of warrant secured. By contrast, the City secured a valid inspection warrant from a neutral magistrate in this case. Because an arrest warrant protects against entry into the home and the forcible inspection warrant already authorized entry, an arrest warrant would serve no purpose.
 
 
 98
 B. There exists yet another lawful basis for the police's entry. When Mr. Quade told the officers he was going to get his gun "and use it," Quade arguably committed several serious felonies in the presence of the police. These additional offenses were not only committed in the presence of the police, but directed at them.
 
 
 99
 Under the California Penal Code, it is unlawful for anyone to attempt "by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law," or to "knowingly resist[ ], by the use of force or violence such officer in the performance of his duty." Cal.Penal Code Sec. 69 (West 1988); see id. Sec. 77 (extending same protection to administrative and ministerial officers). Simple refusal to permit an authorized inspection is a misdemeanor, see Cal.Civ.Proc.Code Sec. 1822.57, but section 69 elevates resistance by threat or violence to a felony. It is also a felony to knowingly confront with a firearm a uniformed peace officer performing his or her official duties. Cal.Penal Code Sec. 417(c) (West Supp.1994).[2] Furthermore, Mr. Quade stated an intention to immediately commit the felony crime of assault with a deadly weapon. Id. Sec. 245(a)-(b). Again, his targets were the inspectors and the police commanded to serve this warrant.
 
 
 100
 Thus, Mr. Quade's resistance and contemporaneous threats of force and violence amounted to the commission of a felony in the presence of the officers as they were serving the warrant, in violation of California Penal Code sections 69 and 77, a felony for which they were entitled, then and there, to make an arrest. Quade's behavior also gave the police probable cause to immediately arrest him as he attempted to violate sections 245 and 417(c). The police did not have to wait until Quade actually got the gun in his hand before they could react.
 
 
 101
 Payton does not foreclose the police from entering a house without an arrest warrant when a felony is contemporaneously committed in their presence. In United States v. Watson, 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976) (emphasis added), the Court, upholding the right to make warrantless felony arrests in public, stated:
 
 
 102
 The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable grounds for making the arrest.
 
 
 103
 In Payton, the Court, distinguishing Watson, observed that the "common-law rule on warrantless home arrests was not as clear as the rule on arrests in public places." 445 U.S. at 596, 100 S.Ct. at 1385. The Court noted:
 
 
 104
 A study of the common law on the question whether a constable had the authority to make warrantless arrests in the home on mere suspicion of a felony--as distinguished from an officer's right to arrest for a crime committed in his presence--reveals a surprising lack of judicial decisions and a deep divergence among scholars.
 
 Id. at 592, 100 S.Ct. at 1383.[3]
 
 105
 The present case is distinguishable from Payton because Mr. Quade committed a felony or felonies in the presence of the officers. In fact, the felonies were directed at the officers. Whether Payton is distinguishable based on the common law of arrest warrants or the existence of exigent circumstances, I do not believe the Fourth Amendment shackles the police from stopping a felony conducted in their presence and directed at them. Cf. United States v. Crespo, 834 F.2d 267, 270-71 (2d Cir.1987) (justifying warrantless entry based on threats made against a federal informant in the presence of federal agents), cert. denied, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988).[4]
 
 
 106
 C. When Mr. Quade threatened to resort to armed resistance, he confronted the officers with a classical and unmistakable situation involving exigent circumstances, i.e., an immediate armed threat to the safety of the police officers, the health inspectors, Mr. Quade's immediate neighbors, and the general public by a barricaded and unstable recluse. I disagree completely with the majority's unsupported and surprising statement that exigent circumstances were not present in this confrontation.
 
 
 107
 There is no such thing as an armed, encircled suspect who is not a threat. People like Mr. Quade frequently shoot from their homes at police and bystanders. Judge Jensen recognized this truth when he discussed the obvious exigencies of the situation: "It could be argued that the officers would have been remiss in their duties had they not formed a perimeter to contain Quade's movement, and to remove persons from the area where they could be shot, after Quade threatened armed response." One of the officers described the situation as follows:
 
 
 108
 A. As best I can recall, after I explained my reason for being there, that I was a police officer and wanted to come in the house and fix the pipes and he should let us in, he said, "I'm going to get my gun and use it."
 
 
 109
 ....
 
 
 110
 Q. What was your understanding who he was going to use it on?
 
 
 111
 A. Well, certainly anybody who entered the house or anybody who was in front of the house.
 
 
 112
 Q. Then what happened?
 
 
 113
 A. And I believed him, and I retreated.
 
 
 114
 Q. Then what did you do?
 
 
 115
 A. I went down and I informed Officer Gough of the conversation, and I decided that we needed more help, specialized help.
 
 
 116
 Q. Okay. So what did you do?
 
 
 117
 A. We contacted--Officer Gough I believe contacted Headquarters by radio and asked for tactical units and negotiations units.
 
 
 118
 ....
 
 
 119
 Q. Would you explain, please, why the threat of a gun would be enough to consider the person in the house for a 5150 [mental health] evaluation?
 
 
 120
 A. Because he may shoot himself, he may shoot a police officer, he may shoot anybody in the community.
 
 
 121
 Q. And that isn't even taking into account the debris in the house.
 
 
 122
 A. That is correct.
 
 
 123
 Q. What happened next?
 
 
 124
 A. We closed off the street so pedestrians wouldn't walk in front of the house and cars would not drive by, and we waited for the specialized units to come and assist us.
 
 
 125
 To argue that the threatened introduction by Mr. Quade of a firearm into these urban circumstances doesn't create an exigency is to ignore late twentieth century reality.
 
 
 126
 The exigent circumstances Mr. Quade created and the dangerous felony behavior he displayed gave the police an additional justification for their response to this precarious situation. In Warden v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 1645-46, 18 L.Ed.2d 782 (1967), the Court held that exigent circumstances justified warrantless entry into a house to search for an armed robbery suspect and weapons because delay would endanger lives of officers and citizens. See also United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-10, 49 L.Ed.2d 300 (1976) (warrantless search justified by exigent circumstances); 2 LaFave, supra, Sec. 6.1(f), at 600-02 (exigent circumstances justifying warrantless entry should be determined "by distinguishing the truly 'planned' arrest from the arrest which is made in the course of an ongoing investigation in the field"). Based on exigent circumstances, the police here had the authority to do exactly what they did--go into the house and arrest Mr. Quade.
 
 
 127
 The Second Circuit's decision in United States v. Crespo, 834 F.2d 267 (2d Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988), is right on point. In that case, federal agents concealed themselves while an informant went to defendant's door. The informant asked the defendant why he had been threatening her. The defendant responded: "I have nothing to do with you, but my people will deal with you." Id. at 269. Believing a crime had been committed in their presence, the agents broke into defendant's residence and arrested him without a warrant. The Second Circuit upheld the warrantless entry based on exigent circumstances. The court noted: (1) defendant committed a serious offense by threatening a federal informant; (2) the agents reasonably believed defendant might be armed; (3) the agents had probable cause to believe the defendant committed a crime because he committed it in their presence; and (4) the agents knew defendant was in the residence because they observed him retreat into his apartment. Id. at 270-71. Because the same factors are present in this case, I would follow Crespo and hold that exigent circumstances existed.
 
 
 128
 I also note that the California Penal Code provides:
 
 
 129
 Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.
 
 
 130
 A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer ... lose his right to self-defense by the use of reasonable force to effect the arrest ... or to overcome resistance.
 
 
 131
 Cal.Penal Code Sec. 835a (West 1985) (emphasis added).
 
 
 132
 Because the police officers in this case had a forcible entry warrant and were met with the threat of armed resistance and behavior patently creating exigent circumstances, Payton is inapposite and yields to Warden v. Hayden and United States v. Crespo.
 
 
 133
 The majority asserts that the officers "wisely eschewed" the exigency argument because it was not supported by the facts. The majority relies on Captain Hettrich's alleged statement that Mr. Quade wasn't "necessarily dangerous" and that the decision to enter the home was motivated, at least in part, by a desire to not keep traffic blocked all day. First, whether or not the officers subjectively believed exigent circumstances existed is irrelevant. We must determine objectively whether exigent circumstances existed. Cf. Florida v. Royer, 460 U.S. 491, 507, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) ("[T]he fact that the officers did not believe there was probable cause ... would not foreclose the State from justifying [defendant's] custody by proving probable cause...."). Second, the majority's reliance on Captain Hettrich's alleged statement is troubling. The statement was not before the district court when it granted summary judgment on the unlawful entry issue. The statement was only quoted in a Supplemental Brief and Trial Memorandum filed after the district court ruled on plaintiff's Payton claim. Apparently, the statement is taken from a videotape of Captain Hettrich's press briefing. I think it is highly improper to reject the existence of exigent circumstances based on the subjective impressions of one officer whose statements are not properly before this court.
 
 
 134
 Therefore, I conclude it is impossible to claim, as does the majority, that under these circumstances the Constitution of the United States required the police to withdraw when Mr. Quade said he was arming himself and to secure an arrest warrant before they could go into his house to arrest him and conduct the authorized inspection. It takes many hours to secure an arrest warrant. The fanciful idea that somehow a magistrate might have diffused this situation is thoroughly unrealistic. Based on over 20 years of securing arrest warrants, I cannot conceive of a magistrate taking over this emergency and withholding an arrest warrant. Such foolhardy action would only extend the exigency and delay its resolution.
 
 
 135
 D. The police officers had a forcible entry inspection warrant. Mr. Quade committed felonies in their presence. Mr. Quade's threatened armed resistance endangered the officers, the general public, and Quade himself. Separately, each of those facts probably authorized the entry into Mr. Quade's home without an arrest warrant. Together, their combined force is irrefutable.
 
 
 136
 I defy the majority to declare what legitimate Fourth Amendment purpose is served by their holding that was not already served when the magistrate authorized a forcible entry and inspection of Mr. Quade's home. All the law I can find indicates that what the City did was not only within the limits of permissible behavior, but followed the prescriptive requirements of the Supreme Court and the Constitution in all material respects. Retreating to the chambers of a magistrate for a third time and securing an arrest warrant would not have altered Mr. Quade's behavior one whit. If the police had returned with an arrest warrant, Mr. Quade would still have been waiting for them, with his gun.
 
 
 137
 Not only was it not clearly established that the police could not do what they did, but indeed, the law was solidly on their side. In my judgment, the law is so clearly on their side that we do not even reach the question of qualified immunity on this issue.[5] When measured by the appropriate standards, the defendants' conduct was perfectly constitutional.
 
 II
 
 138
 It follows from my conclusion that because the police's entry into Mr. Quade's home was lawful and reasonable, the force they used when he pointed his gun at them was reasonable as a matter of law. The majority discounts the danger posed by an armed, urban, barricaded recluse threatening to shoot police and city inspectors. This claim is, with all respect to my colleagues, monumentally mistaken. Anyone who has ever been involved in such a situation knows how dangerous it is. If my colleagues and I were in the area, we would run like blazes for cover when Mr. Quade mentioned a firearm, or certainly hide behind something bulletproof. Surely my colleagues wouldn't suggest everybody should have just gone away and left Mr. Quade alone. Would we blithely walk up to Mr. Quade's door to serve the arrest warrant the majority says should have been secured? Of course not. The situation was terribly precarious. We judges don't go out to serve the warrants we order executed. We ask the police to do it for us. Telling the police that this situation was not dangerous would be laughable if it were not so deadly serious.
 
 
 139
 Both the majority and the plaintiff concede that once Mr. Quade pointed his gun at the police and pulled the trigger, the officers acted reasonably by shooting Quade in self-defense. In fact, the police showed tremendous self-restraint after they entered Quade's home. Quade pointed the gun at the police and panned it back and forth across the officers' faces. The police responded by ordering Quade repeatedly to drop the gun. Quade then said, "I told you I was going to use it." Still, the police held their fire. In fact, the police did not shoot Quade until he pulled the trigger twice!
 
 
 140
 The unchallenged declaration of the lieutenant in charge of San Francisco Police Department's Tactical Squad is dispositive on this issue:
 
 
 141
 The San Francisco Police Department's standing order on the use of force indicates that we could have shot Quade as soon as he pointed the gun at us and became a threat to the officers. We were risking our lives by not firing immediately, but we did not want to shoot him. Once he pulled the trigger, he gave us no choice.
 
 
 142
 So, if the shooting itself is not unreasonable, where's the excessive force? The majority says "[t]he force which was applied must be balanced against the need for that force." To make that determination, the majority again mistakenly applies a subjective analysis, asserting that the officers' purpose for entering Mr. Quade's residence somehow determines whether the force was reasonable. But according to Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872-73, 104 L.Ed.2d 443 (1989) (internal quotations omitted), "the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."
 
 
 143
 The entry was either lawful or unlawful; I think it was, the majority thinks it wasn't. Once inside the house, however, the police certainly did not violate the Constitution by defending themselves when Quade pulled the trigger of his revolver. Deploying a SWAT team when Mr. Quade threatened to shoot a police officer certainly seems reasonable. I just don't see an excessive force claim separate from the unlawful entry claim. Does the majority really want to take issue with the particular tactics used by the police to enter Quade's home? Should we decide how many hours of negotiations must take place before the police can disarm an armed, mentally unstable recluse? Should we determine tactical methods of entry?
 
 
 144
 Such a posture converts members of the judicial branch of government into tactical managers of the police. The court did its job by ordering Mr. Quade's privacy to yield. It was then the police's job to effectuate an entry on behalf of the health inspectors. Judge Kozinski harbors a view of the magistrate/peace officer relationship that is not only unrealistic, but inappropriate. As a practical matter, we judges are ill-equipped (although sometimes we don't think so) to make tactical decisions, especially when weapons are involved and lives are at stake. Anyone who has ever spent time in the field understands how foolhardy it would be for judges, or even prosecutors, to attempt to tell the police how to flush out an armed, barricaded subject. Experienced peace officers understand the necessity of resolving such a situation as quickly as feasible. Leaving Mr. Quade alone would create not only an unacceptable danger for anyone who must then approach his house, it would also continue to put Mr. Quade in danger of injuring himself. The majority may be prepared to second-guess these tough decisions. I am not.
 
 
 145
 Ironically, the plaintiff says the police should have used tear gas or police dogs to discharge their quarry from his home. I didn't know we used tear gas and police dogs to attack people who are not dangerous. Moreover, in other cases in our circuit, we're told that police dogs constitute deadly force.
 
 CONCLUSION
 
 146
 The majority's opinion leaves the law in disarray. In my view, the holdings of this case are at war with (1) Supreme Court and circuit precedents, (2) the Fourth Amendment's standard of reasonableness, (3) the law of qualified immunity, and (4) our responsibility as judges to maintain a body of law upon which executive branch members can rely in doing their work.
 
 
 147
 If I were a police officer, I might reconsider my calling with this kind of misunderstanding of my job and inconsistent messages from the court. As I read this record, it requires summary judgment for the defendants, across the board. Thus, I respectfully dissent.
 
 
 
 [1]
 Plaintiff also sued public health officials and the Mayor of San Francisco, but has not pursued an appeal against those parties
 
 
 [2]
 The Tillery court also noted that the statutory scheme authorizing inspections and inspection warrants (Cal.Code Civ.Proc. Secs. 1822.50 et seq.) was specifically formulated to comply with constitutional mandates, and was enacted in response to the United States Supreme Court's decision in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). It is for this reason that warrants are issued by a neutral judge rather than by the agency itself, and that the owner of the property is given notice before a forcible entry is made. Id. 260 Cal.Rptr. at 322-24
 
 
 [3]
 "[N]o warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const.Amend. IV
 
 
 [4]
 Clifford was a plurality opinion, with Justice Stevens concurring separately. 464 U.S. at 299-305, 104 S.Ct. at 649-53. Justice Stevens' disagreement with the plurality rested on the plurality's conclusion that even the search into the cause of the fire was unlawful in the absence of a warrant or some exception to the warrant requirement. Justice Stevens' position was that furnishing notice to the owners of the house would provide more meaningful protection than an administrative warrant (which the plurality held would be sufficient), since such warrants are issued on a showing of less than probable cause. Id. at 303-05 & n. 5, 104 S.Ct. at 652-53 n. 5
 Justice Stevens also stated, however, that the search for evidence of crime which followed the search into the cause of the fire would have been improper with or without notice to the residents. Id. at 305, 104 S.Ct. at 652-53 (if residents had been given notice, they would have been able to watch while the search was carried out, and "thus might have avoided the plainly improper search of the entire premises after the cause of the fire had already been identified") (emphasis added). Thus a majority of the Justices subscribed to that part of the Clifford opinion on which plaintiff relies.
 
 
 [5]
 We also disagree with Judge Trott's argument that because the "chief evil" Payton guards against is entry into the home, and because the officers had a lawful basis for entry in the form of the forcible entry warrant, there was no Fourth Amendment violation. What Clifford and $124,570 teach is that a lawful administrative search may not be used for the purpose of pursuing law enforcement ends. It was certainly lawful for the luggage inspectors in $124,570 to x-ray passengers' suitcases; but when they did so for the purpose of discovering currency, they violated the passengers' Fourth Amendment rights. 873 F.2d at 1245-46. Judge Trott is right that as an initial matter a forcible entry warrant provides a lawful basis for entry; but what is lawful if done for administrative purposes becomes unlawful if done for law enforcement purposes. $124,570, 873 F.2d at 1244, and authorities cited therein. If the police entered Quade's home for a purpose exceeding the scope of the administrative warrant, their entry pursuant to the warrant was not lawful. We are not persuaded by Judge Trott's argument that the officers' purpose was immaterial because the inspection warrant gave them authority to search the house from top to bottom, and hence the scope of the warrant could not be exceeded. The warrant did not give the officers the authority to arrest Quade. The forcible entry warrant cannot cure the Payton violation, and to suggest that it can is circular
 Judge Trott also argues that because the health inspectors were compelled to make an "individualized showing" in order to secure the forcible entry warrant, the distinction at the heart of Clifford and $124,570 between administrative purposes and law enforcement purposes no longer applies. But it is not enough to make any kind of "individualized showing." The Fourth Amendment requires that the showing which is made correspond to the mission for which permission is sought: a warrant must "particularly describ[e] the place to be searched and the persons or things to be seized." U.S. Const.Amend. IV. Even a criminal search warrant which does not refer to the homeowner's arrest does not provide authority for arrest. In Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), where the police had obtained a criminal search warrant, the Court approved of only a limited detention of the homeowner, incident to the search of the property; thus the search warrant obviously did not provide authority to make the arrest itself. A fortiori, the administrative warrant in this case did not provide authority to make an arrest, and cannot cure the alleged Payton violation.
 
 
 [6]
 Moreover, Capt. Hettrich's testimony may be impeached by his prior inconsistent statement. See supra at 1358
 
 
 [7]
 See infra at 1362-1363
 
 
 [8]
 Indeed, the Summers Court itself was unwilling to extend its holding even to cases where the warrant authorized a search for mere evidence rather than for contraband. 452 U.S. at 705 n. 20, 101 S.Ct. at 2595 n. 20
 
 
 [9]
 Branch I 's response to this tension was to follow those courts which have adopted a heightened pleading standard under these circumstances, and have required plaintiffs suing public officials to plead with particularity facts supporting their allegations of unlawful intent. 937 F.2d at 1385-86. That holding was recently affirmed by this court in Branch v. Tunnell, 14 F.3d 449 (9th Cir.1994) (Branch II )
 
 
 [10]
 California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), relied on by the district court, is not contrary. Id. at 626, 111 S.Ct. at 1550-51 (physical force constitutes a seizure under the Fourth Amendment)
 
 
 [11]
 Nor are the points raised sua sponte by Judge Trott of any assistance to defendants. Judge Trott argues that the officers' entry was justified by exigent circumstances and by Quade's commission of a felony in the presence of Sgt. Heller. Both arguments were wisely eschewed by defendants. The exigency argument is simply not supported by the facts: Capt. Hettrich stated to the press that the situation was not "necessarily" dangerous, and that the police ultimately decided to storm the house because they did not want to keep traffic blocked up all day. The defendants also note that a perimeter was set up around Quade's house "to ensure the safety of bystanders and officers on the scene." Thus according to defendants' own description, steps had been taken to eliminate the exigency which Sgt. Heller identified as existing at the moment Quade made his threat. The record simply does not support Judge Trott's assertion that there was no time to secure a warrant because of the imminent and continuing danger to persons outside the house
 Judge Trott may not avoid this fact by labelling defendants' characterization of the danger Quade presented as "subjective." Capt. Hettrich's eyewitness account is relevant in establishing what happened. And our citation to Capt. Hettrich's videotaped statement is altogether proper. The video was before the district court at the time it disposed of the case in its entirety. In any event we rely on the video not to reject an exigent circumstances argument made by defendants, but rather to explain why it might be that defendants have never raised such an argument, and that therefore the argument is simply not before this court.
 The argument that Quade committed a felony in the presence of Sgt. Heller, while supported by the facts, is without legal significance. If Quade had been in a public place, rather than in his home, the police could have made a warrantless felony arrest on the basis of probable cause whether or not Quade committed the felony in their presence. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Similarly, had Quade been in a public place and committed a misdemeanor in the officers' presence, the officers could also have made a warrantless arrest. Higbee v. City of San Diego, 911 F.2d 377, 379 (9th Cir.1990). But since Quade was in his home, matters stand differently. Payton holds that in order to make a felony arrest in the home, the police must have a warrant, absent exigent circumstances. Under Payton, exigency is the only exception to the warrant requirement; commission of a crime in an officer's presence is not an exception. Judge Trott cites language from Payton's discussion of English common law which suggests that that law may have recognized a "commission in the presence of officers" exception. But Payton 's holding does not embrace this exception. Payton states unequivocally that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. at 590, 100 S.Ct. at 1382.
 Tellingly, Judge Trott does not cite a single case in which an exception to Payton has been made for a subsequent arrest simply because a felony was committed in an officer's presence. Yet we know that criminals commit crimes in the presence of law enforcement agents every day: a great many of our drug cases involve undercover work by the police. If Judge Trott's argument were correct, Payton would not apply in those cases, and the undercover agent, accompanied by his colleagues, at a later time could forcibly enter the home of a person from whom he had bought drugs and make a warrantless arrest of that person. We are not aware of any case in which the government has hazarded such an argument, and we believe any court would reject it as an unwarranted and unsupported erosion of Payton.
 If Judge Trott is making the narrower argument that an officer has a right to enter the home to make an arrest when a felony occurs within an officer's view but inside the suspect's home (with the officer looking in from outside), we agree that in most cases the officer probably does have this right. But that is because there are exigent circumstances, not because some special "commission in the officer's presence" exception is recognized. Indeed, exigent circumstances was the analysis used in the one case we are aware of in which a felony was committed both inside the suspect's home and in the officers' presence, United States v. Crespo, 834 F.2d 267 (2d Cir.1987), cert. denied, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988).
 
 
 [12]
 Thus Judge Trott's observation that the officers showed commendable restraint once inside the house, while accurate, is irrelevant. The excessive force claim turns on the force the officers used in entering the house, not the force they used or didn't use once they had entered
 
 
 [13]
 Thus we need not, and do not, express any opinion on the validity of that argument. We note that the argument was rejected in Scott v. Henrich, 978 F.2d 481 (9th Cir.1992), but that since the briefs in this case were filed, the opinion in Scott has been withdrawn. 994 F.2d 1343 (9th Cir.1993)
 
 
 [1]
 Because I believe the police officers acted reasonably and constitutionally, I obviously concur with the majority's rejection of municipal liability
 
 
 [2]
 Under California law, a felony statute may be used to prosecute an individual even though a special misdemeanor statute covers similar conduct, if the felony statute contains additional elements. See People v. Robertson, 223 Cal.App.3d 1277, 273 Cal.Rptr. 209, 211-12 (1990); People v. Weltsch, 84 Cal.App.3d 959, 149 Cal.Rptr. 112, 113-14 (1978); People v. Hathaway, 27 Cal.App.3d 586, 103 Cal.Rptr. 638, 641 (1972); People v. Firestine, 268 Cal.App.2d 533, 74 Cal.Rptr. 168, 173-74 (1968); People v. Jones, 228 Cal.App.2d 74, 39 Cal.Rptr. 302, 307 (1964); see also People v. Bertoldo, 77 Cal.App.3d 627, 143 Cal.Rptr. 675, 678-79 (1978)
 
 
 [3]
 Blackstone makes the following distinction:
 Any private person (and a fortiori a peace officer) that is present when any felony is committed, is bound by the law to arrest the felon, on pain of fine and imprisonment, if he escapes through the negligence of the stands-by. And they may justify breaking open doors upon following such felon.... Upon probable suspicion a private person may arrest the felon, or other person so suspected. But he cannot justify breaking open doors to do it....
 
 
 [4]
 William Blackstone, Commentaries This distinction survives today under the doctrine of "hot pursuit." See United States v. Santana, 427 U.S. 38, 42-43, 96 S.Ct. 2406, 2409-10, 49 L.Ed.2d 300 (1976)
 
 
 [4]
 The majority contends Quade's commission of a felony in the presence of a police officer is "without legal significance." The majority argues that exigency is the only exception recognized by Payton. But in both Payton and Watson, the Supreme Court relied heavily on the common-law rules of arrest to shed light on what the Framers of the Fourth Amendment meant by the term "reasonable." If the common law recognized a right to arrest for a felony contemporaneously committed in the officer's presence, then this case is more like Watson, where the Court allowed warrantless arrest, than Payton
 The majority also misconstrues my argument by extending it to all undercover cases. My claim, however, is narrower: the police may enter without an arrest warrant if a felony is contemporaneously committed in their presence.
 
 
 [5]
 The majority believes the law "clearly established" the need for the police to secure an arrest warrant before entering Mr. Quade's home, despite the fact that two of the four federal judges who have considered the issue would rule that an arrest warrant was not required. I suppose police officers on the beat are required to have a better appreciation of Fourth Amendment jurisprudence than Judge Jensen and I