53 F.3d 339
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Sheryl NEILL, Plaintiff-Appellant,
v.
CITY OF CONCORD, et al. Defendant-Appellee.
 No. 93-16480.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 13, 1995.
Decided April 20, 1995.
 
 IN PART AND REMANDED IN PART.
 Before: FLETCHER, PREGERSON, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Sheryl Neill appeals the district court's grant of summary judgment in favor of the City of Concord and police officer Timothy Runyon in Neill's action alleging violations of her civil rights under 42 U.S.C. Sec. 1983 and of state law in connection with her detention and arrest for obstructing a police officer in the performance of his duties and for battery of a police officer. We have jurisdiction over this appeal under 28 U.S.C. Sec. 1291. We affirm in part, reverse in part, and remand.
 
 I. BACKGROUND
 A. PROCEDURAL HISTORY
 
 3
 Neill brought the present lawsuit against the City of Concord ("the City") and Officer Runyon for alleged violations of her civil rights under 42 U.S.C. Sec. 1983 and for claimed violations of state law. Neill's complaint charged the City and Officer Runyon with constitutional violations arising from her unlawful detention, unlawful arrest, and the use of excessive force in connection with an encounter between Neill and Runyon that occurred in March 1988.
 
 
 4
 The case proceeded to trial, and the jury returned a verdict in the defendants' favor in February 1990. Neill appealed, and in June 1992, we reversed the district court's judgment and remanded for a new trial because of erroneous jury instructions. On remand, the district court granted summary judgment for the defendants, finding that they were qualifiedly immune from suit under Act Up!/Portland v. Bagley, 988 F.2d 868 (9th Cir. 1993).
 
 B. FACTS SURROUNDING THE ARREST
 
 5
 On Saturday, March 12, 1988, at approximately 1:30 p.m., Runyon, a police officer with three years of experience, accompanied by a citizen rider, was patrolling the neighborhood where Neill's mother and stepfather lived. Runyon was driving a marked patrol car. Runyon knew that recently there had been a number of daytime burglaries in the neighborhood because he had taken burglary reports from residents.
 
 
 6
 According to Runyon, as he was driving southbound on Thornwood Drive towards the intersection with Armand Drive, he saw Neill standing on her tiptoes at a fence surrounding the residence at 4398 Armand Drive, situated at the intersection of Thornwood and Armand, with her hands grasping the top of the fence. Runyon stated that shortly thereafter, he saw Neill walking quickly away from the residence and down Thornwood Drive.
 
 
 7
 Neill's version as to the beginning of this encounter differs from Runyon's. According to Neill, after she grabbed the top of the fence (which she did while talking to her stepfather in the backyard), she walked around the house into the garage to speak with her mother. The garage door to the house was open, music was playing, and there were two cars parked there. After she had this conversation with her mother, she retraced her steps towards Thornwood Drive. As she passed the backyard fence (on Thornwood) for the second time, she again spoke to her stepfather over the fence, but this time did so without stopping or grasping the fence. According to Neill, it was only then that Runyon made contact with her.
 
 
 8
 According to Runyon, his suspicions were first aroused when he saw Neill peer over the fence and then walk quickly away. Runyon then noticed a disheveled black man walk past Neill. Runyon testified that "they both seemed to slow and look at each other intently as they passed each other." Transcript, Volume 3, Feb. 14, 1990, at 185. Runyon felt that "they were working together and possibly casing ... or looking for a house to burglarize." Id. Runyon stated that he did not believe that he had reasonable suspicion to detain Neill until he saw her exchange glances with the black man. Neill denies having even seen a black man on the sidewalk. The citizen-rider in the car with Runyon also did not see a black man.
 
 
 9
 As Neill walked past a driveway on Thornwood Drive, Officer Runyon pulled into the driveway, emerged from his patrol car and, from behind his open door, asked Neill if he could talk to her. Neill stopped but replied that she was in a hurry. Runyon asked Neill if she lived in the neighborhood and she responded affirmatively. Runyon then told Neill he had seen her peering over the fence of a house up the street and asked her what she was doing. Neill answered that the house belonged to her stepfather and that she had been asking him whether he wanted anything from the grocery store. Neill went on to say that if Runyon had a problem with that explanation, he should talk to her parents because she was in a hurry to go.
 
 
 10
 Runyon asked Neill for her driver's license. She had her license in her purse but stepped back without giving it to him. Neill testified that at that point she thought that she had already given a completely adequate explanation for her actions. Because she had also made an offer to have her parents corroborate the explanation, she thought for a moment about why she should give the officer her license. According to Neill, before she had time to produce her license, Runyon grabbed her arm and told her she was not going anywhere.
 
 
 11
 Both agree that Neill then started to run around the back of the patrol car and up the street towards the intersection of Armand Drive and Thornwood Drive. Neill continued some distance pulling Runyon, who was still grasping her arm, until he pushed her down onto a grassy area where he held her against the ground with the weight of his body. Neill struggled against Runyon's efforts to handcuff her. In the midst of this struggle, Runyon was scratched, although the cause of the scratch is disputed.[1] Runyon finally succeeded in handcuffing Neill, although the straps of Neill's purse were locked into the handcuffs during the course of her tussle with Runyon because Neill had refused to release the purse. Neill testified that Runyon jerked her arm back very roughly, and that he put the cuffs on her "as tight as he could." Transcript, Volume 1, Feb. 12, 1990, at 10.
 
 
 12
 Runyon pulled Neill to her feet, moved her to his patrol car and placed her in the back seat. At some point during or after his struggle to handcuff Neill, Runyon told Neill that she was under arrest for obstructing a police officer in the performance of his duties and for battery on a police officer. He then placed the body of her purse outside the back window of the patrol car and asked his citizen rider to roll up the window of the back seat. The citizen rider did so, and Neill was isolated from her purse. By rolling up the window with Neill's arms pulled up behind her, Neill could neither stand nor sit in the patrol car.
 
 
 13
 Neill continued to struggle against the handcuffs. Another officer arrived on the scene, unlocked the handcuffs, released the purse and recuffed Neill. The officer then informed Neill that she was under arrest for assaulting an officer and resisting arrest.
 
 
 14
 Neill was taken to the police station, where she was fingerprinted and photographed. She was then released. A week later she went to the Kaiser Urgent Care center to see a doctor about her wrists. The doctor prescribed Motrin to alleviate her pain. Neill complains that she experienced pain in her arm and shoulder for six weeks after the incident at issue here and in her wrists for eight months afterwards, and that the pain in her wrists persisted on and off thereafter. Neill testified at trial in this matter that she was experiencing numbness in two fingers of each hand approximately twice a week.
 
 II. ANALYSIS
 
 15
 Neill now appeals the rulings of the district court in favor Runyon and the City.
 
 
 16
 We review the district court's summary judgment ruling de novo. Alexander v. City and County of San Francisco, 29 F.3d 1355, 1359 (9th Cir. 1994), cert. denied, 115 S. Ct. 735 (1995). "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there are no genuine issues of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law." Id.
 
 
 17
 The test for determining whether a law enforcement officer is qualifiedly immune from liability for Fourth Amendment violations has two parts: "(1) Was the law governing the official's conduct clearly established? (2) Under the law, could a reasonable officer have believed the conduct was lawful?" Act Up!/Portland, 988 F.2d at 871. The second part of this test is an objective inquiry; the subjective belief of the official as to the lawfulness of his or her conduct is not relevant. Anderson v. Creighton, 483 U.S. 635, 641 (1987). An official is entitled to qualified immunity even where reasonable officers could disagree as to the lawfulness of the official's conduct, so long as that conclusion is objectively reasonable. Act Up!/Portland, 988 F.2d at 872.
 
 
 18
 In Act Up!/Portland we held that under the Supreme Court's decision in Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curiam), "the question of whether a reasonable officer could have believed probable cause (or reasonable suspicion) existed to justify a search or an arrest is an essentially legal question" to be resolved by the court. 988 F.2d at 873 (internal citation and quotation marks omitted). Put another way, we held that "[whether or not a reasonable officer would have known that his or her conduct violated clearly established law 'is not in itself a factual issue that can preclude summary judgment."' Alexander, 29 F.3d at 1364 (quoting Act Up!/Portland, 988 F.2d at 873). But when there is a dispute either as to the facts and circumstances within an officer's knowledge, or as to the conduct underlying the alleged violation, then those factual issues must be decided by a jury before the district court can make any determination as to qualified immunity. Alexander, 29 F.3d at 1364; Act Up!/Portland, 988 F.2d at 873.
 
 A. DETENTION
 
 19
 Neill agrees with the district court that the law on detention was clearly established at the time that this incident occurred. A police officer may stop an individual to investigate suspected criminal activity if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). But Neill argues that under Act Up!/Portland, there are factual disputes in the record that preclude a finding of summary judgment for the defendants on the issue of qualified immunity.
 
 
 20
 We agree with Neill that there are disputed facts as to "the facts and circumstances within [Officer Runyon's] knowledge" and as to "what the officer and [Neill] did or failed to do" that proclude a ruling on summary judgment that Runyon is qualifiedly immune from Neill's unlawful detention claim. Act Up!/Portland, 988 F.2d at 873.
 
 
 21
 The magistrate judge based her finding of reasonable suspicion on Runyon's testimony that Neill grabbed the top of the fence and "[s]hortly thereafter, ... could be seen walking quickly away from the residence and down Thornwood Drive." However, Neill's testimony conflicts with this description of the events. She testified that after she grabbed the top of the fence, she walked around the house into the garage to speak with her mother. It was only after she had done this that she retraced her steps and proceeded toward Thornwood Drive. Neill says that she walked past the fence a second time without stopping, and that it was only then that Runyon approached her.
 
 
 22
 This conflict in the evidence constitutes a dispute over "what the officer and claimant did or failed to do," Act Up!/Portland, 988 F.2d at 873, and thus summary judgment on Runyon's qualified immunity as to the unlawful detention claim was inappropriate.
 
 B. ARREST
 
 23
 Neill does not dispute that the law governing arrest is clearly established. A police officer has probable cause to arrest a suspect "if 'at the moment the arrest was made ... the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing"' that a violation of the law has occurred. Hunter, 502 U.S. at 228 (quoting Beck v. Ohio, 37 U.S. 89, 91 (1964)).
 
 
 24
 Runyon arrested Neill for obstructing an officer in the performance of his duties (Cal. Penal Code Sec. 148)[2] and battery on an officer engaged in the performance of his duties (Cal. Penal Code Sec. 243(b)).[3]
 
 
 25
 Both parties agree that Neill "stepped back" after Runyon asked to see her driver's license. However, Neill testified that after she had given what she thought was a completely adequate explanation and made an offer to have her parents corroborate it, she was not given adequate time to respond to the demand to see her license before Runyon grabbed her arm. Runyon testified that Neill was trying to run away.
 
 
 26
 Again, as with Neill's unlawful arrest claim, we are faced with a material dispute as to the conduct underlying the alleged violation. This is a factual issue which must be decided by a jury before the district court can make any determination as to qualified immunity. Alexander, 29 F.3d at 1364; Act Up!/Portland, 988 F.2d at 873.
 
 C. EXCESSIVE FORCE
 
 27
 Neill argues that Runyon applied excessive force in arresting her. At the time of this incident, allegations of the use of excessive force under color of state law were analyzed under the Fourth Amendment. See Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993) ("the use of excessive force by officers in effecting an arrest was clearly proscribed by the Fourth Amendment at least as early as 1985") (citing Tennessee v. Garner, 471 U.S. 1 (1985)). "[A] police officer's use of force in apprehending a suspect violates the Fourth Amendment if it is unreasonable in light of the facts and circumstances confronting the officer." Alexander, 29 F.3d at 1366.
 
 
 28
 Neill asserts that the manner in which Runyon applied the handcuffs was excessively forceful. The facts surrounding this claim are in dispute. The magistrate judge found in her order that Neill was handcuffed and placed in the patrol car with the window rolled up so as to isolate Neill from her purse, which Runyon had locked into the handcuffs. This fact-finding omits Neill's testimony that Runyon used the handcuffs to jerk her around and that by rolling up the window, she could neither stand nor sit.
 
 
 29
 We conclude that because there are material facts in dispute as to Neill's excessive force claim, Runyon is not entitled to qualified immunity. Neill's testimony, if credited, would establish that Runyon's use of force was excessive in violation of the Fourth Amendment. See Palmer, 9 F.3d at 1436 (unreasonably injuring a person's wrists while applying handcuffs constitutes excessive force); Hansen v. Black, 885 F.2d 642, 645 (9th Cir. 1989) (same).
 
 D. MUNICIPAL LIABILITY
 
 30
 The defense of qualified immunity is not available to municipalities. Owen v. City of Independence, 445 U.S. 622, 650 (1980). But a municipality will not be held liable for the unconstitutional acts of its employees under a theory of respondeat superior. Monell v. Department of Social Services, 436 U.S. 658, 691 (1978). Instead, municipalities may be sued only for their own unconstitutional or illegal policies. Id. at 694.
 
 
 31
 After its ruling in Monell, the Supreme Court held that one of the ways in which municipal liability may attach is where a final policymaker ratifies both a subordinate's unconstitutional decision or action and the subordinate's basis for that decision or action. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988); see also Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir. 1992), cert. denied, 114 S. Ct. 345 (1993). Here, Neill asserts that the City of Concord is liable because it ratified Runyon's allegedly unconstitutional actions. In support of this, Neill asserts that because the city council took no action against Runyon, the City therefore impliedly ratified his conduct.
 
 
 32
 Neill has not offered any proof that the city council approved Runyon's actions. As was the case in Gillette, the most that Neill has shown is that the city council did not punish Runyon for his discretionary act. See Gillette, 979 F.2d at 1348. This is insufficient as a matter of law to hold the City liable under 42 U.S.C. Sec. 1983.
 
 III. CONCLUSION
 
 33
 We AFFIRM the district court's summary judgment for the City. But because genuine issues of material fact exist as to Runyon's qualified immunity against Neill's claim of unlawful detention and arrest, as well as excessive force, we REVERSE the judgment of the district court in favor of Runyon on the qualified immunity issue, and REMAND for further proceedings.
 
 RYMER, Circuit Judge, dissenting:
 
 34
 Because I believe, under Neill's version of the facts, that a reasonable officer could believe his actions did not violate Neill's constitutional rights, I dissent.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Neill suggested in her testimony at trial that Runyon was scratched by one of the safety pins on her purse. Runyon testified that Neill scratched him
 
 
 [2]
 California Penal Code Section 148(b) states in relevant part:
 (b) Every person who willfully resists, delays, or obstructs any ... peace officer ... in the discharge or attempt to discharge any duty of his or her officer or employment ... is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment.
 Cal. Penal Code Sec. 148(b).
 
 
 [3]
 California Penal Code Section 243(b) states in relevant part:
 (b) When a battery is committed against the person of a police officer ... engaged in the performance of his or her duties ... and the person committing the offense knows or reasonably should know that the victim is a peace officer ... engaged in the performance of his or her duties ... the battery is punishable by a fine not exceeding two thousand dollars ($2000), or by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment.
 Cal. Penal Code Sec. 243(b).