978 F.2d 481
 Doris A. SCOTT, individually and as Personal Representative
of the Estate of John William Scott, deceased,
Plaintiff-Appellant,
v.
James L. HENRICH; David J. Flamand; Butte-Silver Bow Law
Enforcement Agency; City of Butte; County of
Silver Bow, Defendants-Appellees.
 No. 91-35429.
 United States Court of Appeals,
Ninth Circuit.
 Submitted June 3, 1992*.
Decided Oct. 15, 1992.
 
 Curtis G. Thompson, William D. Jacobsen, Jardine, Stephenson, Blewett & Weaver, Great Falls, Mont., for plaintiff-appellant Doris A. Scott.
 Brendon J. Rohan, C. Richard Anderson, Poore, Roth & Robinson, Butte, Mont., for defendants-appellees Henrich, Flamand, and Butte-Silver Bow Law Enforcement Agency.
 Gregory C. Black, Marshal Mickelson, Corrette, Smith, Pohlman & Allen, Butte, Mont., for defendants-appellees City of Butte and County of Silver Bow.
 Appeal from the United States District Court for the District of Montana.
 Before: FARRIS, NORRIS and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 Doris Scott contends that the police officer defendants acted unreasonably by killing her husband John Scott.[1] We consider the amount of proof needed to overcome a motion for summary judgment in a deadly force case.
 
 Facts
 
 2
 Officers Flamand and Henrich were called to 701 West Park Street in Butte, Montana, in response to reports that a man was firing a gun there. A few minutes earlier, they had received reports of shots fired at a nearby address. When the officers arrived at the 701 West Park area, a motel manager pointed to the two-story apartment building across the street where the gunman had entered via one of the street-level doors. A boy named Jason Smith told Flamand that "he had seen a man fire a shot or a couple of shots ... and that [the man] was acting strange or crazy and he was staggering." Flamand then observed a man in the second-story window of the building.
 
 
 3
 Flamand and Henrich quickly approached the street-level door. Henrich banged and kicked the door and yelled something to the effect of "Police, police officers, open up." Flamand stood behind Henrich and covered him. A few minutes later, Henrich again banged the door and identified himself as a police officer. The officers then heard fumbling with the lock of the door. The door opened, and John Scott stood in the doorway. According to the officers, Scott held a "long gun" and pointed it at them. Officer Henrich fired a shot that missed Scott. Officer Flamand, apparently believing Scott had fired this shot, fired four shots at Scott, one of which caused the fatal wound.
 
 Discussion
 
 4
 * Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). An officer's use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985); see also Graham, 490 U.S. at 396, 109 S.Ct. at 1871 (one of factors in determining reasonableness is "whether the suspect poses an immediate threat to the safety of the officers or others"). All determinations of unreasonable force "must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S.Ct. at 1871-72.
 
 
 5
 The officers here raise the defense of qualified immunity, which shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "In Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits." Hopkins v. Andaya, 958 F.2d 881, 885 n. 3 (9th Cir.1992). But, even though reasonableness traditionally is a question of fact for the jury, see, e.g., White v. Pierce County, 797 F.2d 812, 816 (9th Cir.1986); Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131, 1179 (1991), defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.
 
 
 6
 Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story--the person shot dead--is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. Hopkins, 958 F.2d at 885-88; Ting v. United States, 927 F.2d 1504, 1510-11 (9th Cir.1991). In other words, the court may not simply accept what may be a self-serving account, but must exercise a fair degree of skepticism in determining whether the officer--as sole surviving witness and intensely interested party--is telling the truth.
 
 II
 
 7
 A. Plaintiff initially argues that the officers should have used alternative measures before approaching and knocking on the door where Scott was located. But, as the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them. See, e.g., Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983); United States v. Martinez-Fuerte, 428 U.S. 543, 556-57 n. 12, 96 S.Ct. 3074, 3082-83 n. 12, 49 L.Ed.2d 1116 (1976). Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. In the heat of battle with lives potentially in the balance, an officer would not be able to rely on training and common sense to decide what would best accomplish his mission. Instead, he would need to ascertain the least intrusive alternative (an inherently subjective determination) and choose that option and that option only. Imposing such a requirement would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. It would also entangle the courts in endless second-guessing of police decisions made under stress and subject to the exigencies of the moment.
 
 
 8
 Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable. The officers here clearly did: It's hardly unreasonable for officers to take arms, knock on the door of an apartment and identify themselves as police when an armed man who, they are told, recently fired shots and is acting "crazy"[2] lurks inside.
 
 
 9
 B. As to the shooting itself, the initial question is whether Scott was holding a gun when he opened the door; if he wasn't, then the officers would not have been acting in self-defense, and thus the shooting would not have been reasonable.[3]
 
 
 10
 There's no internal inconsistency in the officers' statements, nor any inconsistency between them: Both Henrich and Flamand have unfailingly and forcefully stated they fired shots because they feared for their lives when the door opened and they saw Scott standing there with a gun pointed at them.[4] Because no other witnesses testified as to whether Scott held a gun, we must determine whether the record contains other evidence that contradicts the officers' story, or at least casts some doubt on it.
 
 
 11
 There is only one piece of evidence that could possibly raise a genuine issue of material fact as to whether Scott held a gun: No fingerprints of value were found during the subsequent examination of the gun Scott was allegedly holding.[5] Scott argues that a rational jury might infer from the absence of fingerprints that Scott wasn't holding the gun. But though we construe all facts and draw all inferences in favor of the non-moving party, in this case Scott, Anderson v. Liberty Lobby, 477 U.S. 242, 255-56, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986), the record must be sufficient to let a rational factfinder find that the inference nonmovant suggests is more likely than not true. City of Vernon v. Southern Cal. Edison Co., 955 F.2d 1361, 1369 (9th Cir.1992), cert. den., --- U.S. ----, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992). A mere scintilla of evidence isn't enough. Id.
 
 
 12
 All Scott gives us is a scintilla. It's true that, in the popular mythology, people leave telltale fingerprints on everything they touch. But in real life that's just not so. Scott's fingers might not have had enough sweat on them to leave prints.[6] The gun's surface might have been too rough to take prints.[7] The smooth parts of the gun might have been too small to take prints sufficient for identification.[8] "Experience has shown that it is possible to examine quite a number of articles which have been recently handled with the result that there is a surprising lack of anything approaching even the suggestion of a finger mark."[9] The verdict of a jury can't rest on mere speculation or uneducated guess--which is all a jury could make in this case without expert testimony[10]--among several likely theories. Neely v. St. Paul Fire & Marine Ins. Co., 584 F.2d 341, 345-46 (9th Cir.1978) (that defendant's theory of the facts could possibly have been true isn't sufficient; "the connection between the proffered evidence and the conclusions urged is too tenuous to permit a jury to make it"); Wolf v. Reynolds Elec. & Eng'g Co., 304 F.2d 646, 649 (9th Cir.1962).
 
 
 13
 The record does show, as plaintiff notes, that Scott's gun was unloaded at the time of the incident. But unless the officers knew or should have known this fact, it is irrelevant. Officers are entitled to assume, in the absence of clear evidence to the contrary, that weapons are loaded. Cf. United States v. Martinez-Jimenez, 864 F.2d 664, 666-67 (9th Cir.) (toy gun counts as dangerous weapon for purposes of federal bank robbery statute), cert. denied, 489 U.S. 1099, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989). Plaintiff has introduced no evidence that the police officers knew, or had reason to know, that Scott's gun was unloaded, nor do we find anything in the record suggesting that the officers were aware the gun was unloaded. Nothing in the record, therefore, casts doubt on the officers' assertion that they reasonably believed Scott posed a deadly threat at the moment he opened the door.
 
 
 14
 Plaintiff points out that the fatal bullet entered Scott's side area and asks us to infer that Scott was not facing the officers, and therefore not really in a position to shoot at them even if he was holding the gun. We are reluctant to second-guess police officers as to the exact orientation of someone who opens a door holding a gun after police have knocked and identified themselves. In any event, the autopsy pictures graphically show stippling (marks caused by glass particles or burning gunpowder) on Scott's stomach. It is thus clear that Scott was facing in the direction of one of the officers when that officer fired at least one of the bullets. See also Testimony of William Newhouse, Transcript of Coroner's Inquest of Oct. 23, 1984, at 75 ("the individual had to be facing that shotgun at one time or another with one of those shots"). That the fatal bullet entered Scott's side proves only that Scott may not have been entirely motionless during the shooting.
 
 
 15
 In addition, there's no indication in the record that, during the few seconds of gunfire, a definite pause occurred where the perceived threat from Scott dissipated--in other words a moment where Scott threw down the gun or yelled "I surrender" or "Don't shoot." Thus, this is not a case where the threat abated and the officers had time to regroup, and then used deadly force despite the reduced threat. Cf. Hopkins, 958 F.2d at 886-87.
 
 
 16
 Plaintiff was not unfairly surprised or given insufficient time to come up with evidence in opposition to the motion for summary judgment. The district court granted plaintiff a continuance to allow her to obtain further evidence on the reasonableness of the officers' shooting, but plaintiff failed to do so.
 
 
 17
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 [1]
 Plaintiff named other defendants in her complaint, but her claims against them are dependent on this claim and will become relevant only if we reverse
 
 
 [2]
 In fact, Scott was drunk. Very, very drunk. He had a blood alcohol content of .312
 
 
 [3]
 Plaintiff has not contended in arguments to the district court or this court that Scott was not holding a gun. See Plaintiff's Supplemental Brief Opposing Summary Judgment (nowhere arguing that Scott may not have held a gun when he opened the door); Plaintiff's Opening Brief (same); see also Transcript of District Court Hearing of May 5, 1989, at 40. Nevertheless, as the question goes to the reasonableness of the officers' conduct, we will consider it. Cf. Shah v. United States, 878 F.2d 1156, 1163 (9th Cir.1989)
 
 
 [4]
 Neither officer has a history of excessive force. Cf. Hopkins, 958 F.2d at 884. In fact, the officers had not previously discharged a weapon at another person during their combined 24 years of police service. Transcript of Shooting Review Board Hearing of Oct. 10-11, 1984, at 18, 30
 
 
 [5]
 Pictures of the crime scene show the gun lying on the floor next to Scott's dead body
 
 
 [6]
 This can easily happen when the sweat has been rubbed off "by the frictional action when grasping a number of articles." Frederick R. Cherrill, The Finger Print System at Scotland Yard 113 (1954)
 
 
 [7]
 "Some surfaces may be checked, milled, or otherwise rough, which makes the recovery of latent prints very difficult." Robert D. Olsen, Sr., Scott's Fingerprint Mechanics 416 (1978)
 
 
 [8]
 Often, especially on guns, "[e]xposed smooth surfaces ... are not large enough to take latent prints sufficient for identification, if the firearm is held in the normal manner for operation." Id
 
 
 [9]
 Cherrill, supra note 6, at 112
 
 
 [10]
 Fingerprints are the paradigm example of evidence that is beyond the ken of lay jurors and thus requires expert testimony. See, e.g., United States v. Huffhines, 967 F.2d 314, 320 (9th Cir.1992); Cooper v. Dupnik, 963 F.2d 1220, 1228 (9th Cir.1992) (en banc), pet. cert. filed, 61 U.S.L.W. 3112 (Aug. 3, 1992) (No. 92-210); United States v. Heffington, 952 F.2d 275, 280 (9th Cir.1991); Mikes v. Borg, 947 F.2d 353, 358 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3055, 120 L.Ed.2d 921 (1992); Taylor v. Kincheloe, 920 F.2d 599, 609 (9th Cir.1990), all involving the use of experts to explain fingerprint evidence